SPOMENKA RYBAK, Plaintiff and Counterdefendant and Appellant and Cross-Appellee, v. ORRIN DRESSLER *et al.*, Defendants and Counterplaintiffs and Appellees and Cross-Appellants.

Second District No. 2—87—1238

Opinion filed December 29, 1988.—Rehearing denied February 7, 1989.

572

Herbert L. Stride, of William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for appellant.

Laura Hois, of Katten, Muchin & Zavis, and Thomas W. Fawell & Associates, P.C., both of Oak Brook (Thomas W. Fawell, of counsel), for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

In the circuit court of Du Page County, plaintiff, Spomenka Rybak (Rybak), filed a complaint for a constructive trust, mandatory injunction, and a judgment in the amount of $352,000 plus interest and 50% of the value of improved real estate (a residence) against defendants, Orrin D. Dressler individually and doing business as Orrin Dressler, Inc., a corporation (defendants, Dressler or O.D., Inc.). Defendants counterclaimed for a constructive trust and fraud. This court affirmed the trial court's dismissal with prejudice of the defendants' fraud claim for legal insufficiency. (*Rybak v. Dressler* (2d Dist., 1984), No. 2—84—0002 (unpublished Rule 23 order), 127 Ill. App. 3d 1167.) The cause proceeded to bench trial and concluded with entry of a judgment awarding Rybak $201,831.59 ($125,464.02 plus interest) and denying her all other relief requested. The court's judgment also found for Rybak and against the defendants on their counterclaim for a constructive trust seeking $300,000 from her. Both sides appeal.

Rybak's appeal presents these issues: (1) whether the trial court's determination there was no valid promissory note in the amount of $325,000 was against the manifest weight of the evidence; (2) whether the trial court committed reversible error in failing to rule that the defendants admitted the genuineness of the documents attached to her first Rule 216 (107 Ill. 2d R. 216) request where said request was not denied in a timely fashion; and (3) whether the trial court erred in calculating the total value of loans from her to Dressler.

The defendants' cross-appeal presents these further issues: (1) whether the trial court erred in finding Rybak made loans to the defendants; (2) whether the trial court's finding that Rybak did not convert Dressler's business funds to her own use is contrary to the

manifest weight of the evidence; (3) whether the trial court abused its discretion in denying defendants' post-trial motion to vacate the judgment on the grounds of newly discovered evidence; and (4) whether the court erred in awarding prejudgment interest.

Facts necessary for an understanding of the issues will be presented as necessary in conjunction with analysis of each issue. Suffice it to say that Rybak, an Illinois-licensed dentist, met Dressler, an Oak Brook land developer, in the summer of 1975 and the parties engaged in a social relationship which evolved into cohabitation. In late 1976, Dressler, Rybak and Rybak's young son, William, lived together first in Rybak's apartment, then in 1978, in an apartment in Burr Ridge and then, in 1980, in a house in Oak Brook which Dressler also used as an office. Rybak moved out of the house in August 1982, and these lengthy, bitter proceedings ensued.

Rybak's second amended complaint against the defendants alleged that she was employed in various capacities by the defendants and that the defendants agreed in 1978 by execution of a written employment agreement to compensate her for her past and future services; that between 1976 and 1982 she made various business and personal loans to Dressler and O.D., Inc., which each agreed to repay to her with interest; that on March 2, 1981, the defendants executed a promissory note payable to her in the amount of $87,918 as repayment for loans made by her to them to date, with interest, and promising to convey or cause to be conveyed to her lots 4, 27, and 43, in the Lakewood subdivision in Burr Ridge; that as further inducement to her to continue to make loans and provide services to the defendants, they promised to convey title to Dressler's Oak Brook residence and property to a land trust and assign the beneficial interest in said land trust to her and apply the proceeds of sale of the residence to repayment of their indebtedness to her and pay her one-half of the capital gain from the sale of the residence; that she continued to make loans to the defendants; that in January 1982 she demanded from Dressler an accounting, repayment of the loans, and payment for services rendered, and Dressler and she agreed on March 10, 1982, that the total sums due her including interest totaled $325,000 whereupon Dressler executed and delivered to her a promissory note due on demand for $325,000 and agreed to pay interest on the indebtedness evidenced by said note at the prime rate of interest charged from time to time by the Bank of Clarendon Hills; that she subsequently loaned Dressler $27,700, which defendants agreed to pay with interest; that on numerous occasions she demanded repayment of the loans evidenced by the promissory note, conveyance of title to the lots and pledge of the

collateral but that she has not received and defendants have failed and refused to honor the promissory note, convey title to the lots, pledge the collateral or repay the loans made subsequent to March 10, and Dressler has advised her that he never intended to do so having made all the above promises only to induce her to loan him and O.D., Inc., additional sums and provide them with additional services. Rybak requested judgment against the defendants in the sum of $352,700 plus interest from March 10, 1982, court costs and reasonable attorney fees. She also requested a declaratory judgment declaring a constructive trust and equitable lien upon the lots and the residence and a mandatory injunction directing defendants to sell the lots and residence and pay her the sums due from the proceeds or convey title to the lots to her, credit the fair market value thereof against the sum due her and sell the residence, paying her the balance due her from the proceeds of the sale.

Count I of the defendants' amended counterclaim against Rybak alleged that during the period from approximately 1977 to August 1982, Rybak, acting in the capacity of corporate secretary for O.D., Inc., for no compensation at her insistence, owed a fiduciary duty to O.D., Inc., and its shareholders; that Rybak, while cohabiting with Dressler and acting as an officer of O.D., Inc., had ready access to cash, checking accounts, and various goods and chattels belonging to defendants; that during said time period, Rybak, without the knowledge or consent of the defendants, took for her own use and benefit cash, assets and other goods and chattels totaling $300,000. Defendants requested a constructive trust be imposed upon Rybak's assets and that they be awarded judgment against her in the amount of $300,000 plus costs and attorney fees, and that the court award such other relief as it deemed just and equitable. As noted above, count II of defendants' amended counterclaim for fraud was dismissed with prejudice and that judgment was affirmed by this court on appeal.

### $325,000 PROMISSORY NOTE

In its letter of opinion upon which its judgment was based, the trial court found:

> "There was no valid note for $325,000. The original of the purported note is missing. Even if the note was signed by the defendant, a finding this court did not reach, its non-existence, the lack of full consideration and the circumstances under which it was allegedly executed would require a finding that it was not valid. This court so finds."

Rybak argues the court's finding is against the manifest weight of

the evidence where (1) the note clearly does exist; (2) Dressler's theory as to how his signature came to be on the note is not supported by the record; (3) the stated basis for the defendants' expert witness' opinion that the note was a "raised" note (that is, a note on which the amount has been raised) were irrelevant, nonsensical and immaterial; and (4) defendants failed to rebut the presumption that consideration is presumed in an action on a validly executed negotiable instrument.

Defendants admit the note exists and that the signature on the note is Dressler's but that the court's finding that there was no valid note was not against the manifest weight of the evidence where (1) Dressler testified the note he signed was in the amount of $325 not $325,000 and was signed at Rybak's request and upon her representation that the note was to secure O.D., Inc.'s, obligation to a gravel hauler; (2) where he met his burden of proving that the note was altered; (3) where the evidence showed he was elsewhere at the alleged time and place of the signing of the note; (4) where his theory of how his signature came to be on the note is not rebutted by the evidence; (5) where Rybak's testimony concerning the circumstances of the signing of the note was inherently improbable; (6) where there was testimony that Rybak disclosed to neighbors that she had his original signature on a note and that she intended to "fix" him and "get everything" he owns; and (7) where there was no consideration for the note in light of Rybak's conflicting versions of what the basis for such consideration was and there was no bargained-for forbearance.

■■ ■ We reverse the judgment of the trial court. Generally, "[t]he trial judge as trier of fact is in a position superior to a court of review to observe the conduct of witnesses while testifying, to determine their credibility, and to weigh the evidence, especially where testimony is contradictory. [Citation.] Where the factual findings of the trial court are not against the manifest weight of the evidence, they must be accepted by [the reviewing] court. [Citation.]" *(In re Department of Transportation* (1988), 173 Ill. App. 3d 730, 734.) For a trial court's finding to be against the manifest weight of the evidence, it must appear that a conclusion opposite to that reached by the trier of fact is clearly evident. *(Tharp v. Critton* (1985), 135 Ill. App. 3d 796; *Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87.) Such an opposite conclusion is clearly evident here.

■ At the outset, the court's finding that the note was either "missing" or "non-existent" is plainly erroneous. During trial, the court allowed a photocopy of the original note to be used during trial, and, per stipulation of the parties, this court granted leave on Novem-

ber 1, 1988, to supplement the record to include the original of plaintiff's exhibit No. 163, the original promissory note, which was done.

As Rybak points out in her reply brief, the trial court did not specify exactly what it meant by the "circumstances under which [the note] was allegedly executed." However, taken literally, its reference must have been to the circumstances of how Dressler's signature came to be on the note and, as to those circumstances, the evidence does not support Dressler's proffered explanation.

■■ Under article 3 of the Uniform Commercial Code—Commercial Paper (the Code) (Ill. Rev. Stat. 1985, ch. 26, par. 3—101 *et seq.*), where a signature on a note is admitted, production of the instrument entitles the holder to recover on it unless the defendant establishes a defense. (Ill. Rev. Stat. 1985, ch. 26, par. 3—307(2); *Swerdlow v. Mallin* (1985), 131 Ill. App. 3d 900; *American National Bank & Trust Co. v. Scenic Stage Lines of Savanna, Inc.* (1971), 2 Ill. App. 3d 446.) "The defendant has the burden of establishing any and all defenses, not only in the first instance but by a preponderance of the total evidence." (Ill. Ann. Stat., ch. 26, par. 3—307, Uniform Commercial Code Comment, at 204 (Smith-Hurd 1963); see also *State Bank v. Young* (1986), 149 Ill. App. 3d 460; *Tuttle v. Rose* (1981), 102 Ill. App. 3d 865; *In re Estate of Ruebush* (1964), 53 Ill. App. 2d 54.) Further, where alteration is not apparent on the face of the instrument, the party alleging that the note sued on has been altered has the burden of proof on that issue. (*Bowers v. Heflebower* (1926), 243 Ill. App. 129.) When a person signs and executes a form instrument without filling in all the blanks, such person by implication authorizes the holder of the instrument to fill in the blanks in accordance with the underlying agreement; in the absence of evidence tending to show that completion of the instrument was unauthorized, it will be presumed that the instrument incomplete when executed is properly filled out. (*Hutcheson v. Herron* (1970), 131 Ill. App. 2d 409.) Ambiguous evidence is insufficient to dispel the absolute and unconditional obligations that are represented by a promissory note. *First National Bank v. Achilli* (1973), 14 Ill. App. 3d 1.

■■ Dressler's contention the note was to be for $325 for a trucker to deliver stone to the residence of Federal Judge Charles Korcoras is contradicted by Judge Korcoras' evidence deposition and exhibits, which show that he did not receive any stone after December 1981 and that the second of only two invoices he ever received from Dressler, dated December 20, 1981, included a $354 charge for stone from Bob's Trucking. Dressler testified the March 10, 1982, promissory note for $325 was to guarantee payment to the trucker hired

since their usual hauler, Bob's Trucking, was unavailable for the Korcoras delivery.

As such, Dressler's evidence does not establish a defense to the note by a "clear preponderance" of the evidence; that is, evidence sufficient to incline an impartial and reasonable mind to one side of an issue rather than the other. (*In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 13.) This is particularly so in light of Rybak's version of the circumstances of the execution of the note which was corroborated by her son, William Rybak, who was age 17 at the time of trial in 1986. Rybak testified she mentioned to Dressler during the first few months of 1982 her concerns over repayment of monies she had loaned him. She testified Dressler told her he figured he owed her $325,000, and on the morning of March 10, he left her an IOU for $325,000. After leaving her office on March 10, 1982, Rybak bought a sheet of promissory notes. Late in the evening of March 10, 1982, she was seated at the kitchen table at the Oakbrook residence with her son William (Billy), assisting him with his homework, when Dressler arrived. Dressler had told her that he would be at Midwest Helicopter Airways that evening preparing for the boat trip he was going to take. Upon arriving at the house, Dressler began packing for a trip he was taking to the Bahamas the next day and was in and out of the kitchen.

Rybak testified that Dressler instructed her during the course of about one hour how to fill out the promissory note and that in doing so she probably used more than one pen. She further stated that after she filled out the promissory note, Dressler signed it with a pen he carried in his pocket. She stated Dressler read it prior to signing it. After Dressler signed the note, she placed it in Billy's room and told Billy where it was. Billy corroborated Rybak's version of the signing of the note and testified to a middle-of-the-night riffling by Dressler of Billy's desk in August 1982. Billy asked what Dressler was doing, and Dressler asked Billy if Rybak had brought any papers in there, specifically, "that note," "the promissory note." Billy told him to ask Rybak, and Dressler "went huff, huff, and took off." Billy also testified to an incident in June 1982, when he, his mother, his grandmother, his mother's friend Mirjana Petrovich, Petrovich's mother, and Dressler were in the kitchen of the house in Oak Brook. With Mirjana Petrovich translating, Rybak's mother asked Dressler if he had any intention to pay back Rybak the monies he owed her. Dressler brought various documents to the room and asked Rybak to bring the March 10, 1982, note to the room. He then explained to Rybak's mother that these were documents which outlined his and Ry-

bak's dealings with each other and that he had every intention of paying her back. Afterward, Rybak kept the note and Dressler kept the other documents.

Dressler's evidence offered to prove he was not at the house on March 10 when the note was signed also does not establish a defense to the note by a "clear preponderance" of the evidence. Rybak presented three witnesses other than her son whose testimony contradicted the circumstances of Dressler's presence at Midwest Helicopter on the evening of March 10 and his purported absence from the house on that evening. Dressler testified that he had been at Midwest Helicopter Airways until approximately 3 a.m. In support of this contention, Richard Smith, Maxine Hansen, John Hansen and Gil Gusler each testified to seeing Dressler at Midwest Helicopter Airways on the night of the 10th of March, a Wednesday, until 1:30 a.m. or later. Willowbrook police commander Richard Kleven also testified to seeing Dressler there between 10:35 and 10:55 p.m. during a security check of Midwest Helicopter. Some of these witnesses testified that it was during this time that a trailer hitch was added to the back of Rybak's Cadillac for the purpose of towing the boat to Florida. One or more of these individuals stated that Dressler and James Miller left with the Cadillac and boat on Thursday, March 11. Gil Gusler, however, testified that the hitch was probably put on Monday or Tuesday, March 8 or 9, and that he observed Dressler and Miller welding it on to the Cadillac. Miller testified that the hitch was placed on the car on the evening of March 10, 1982.

Judy Littleton, an employee of Rybak, testified that on March 9, 1982, she drove Rybak home because Rybak did not have her brown Cadillac with her that evening. Barbara Ann Deutsch, a patient of Rybak, testified that she needed emergency dental work done and that she met Rybak at Rybak's dental office at 4:55 p.m. on March 10, 1982. Rybak showed her a pink piece of paper, the size of a 3 inch by 5 inch index card which stated "IOU $325,000, love, Orrin Dressler." She and Rybak discussed their financial troubles often inasmuch as she visited Rybak for treatment over 100 times in a two-year period. Deutsch further stated that prior to entering the building, she had seen Rybak getting out of a dark brown Cadillac and noted that the boat hitch was put on wrong and that the coloring was off. Mirjana Petrovich, a long-time friend of Rybak's, testified she called Rybak from Austria about midnight Oakbrook time on the evening of March 10, 1982. She indicated that it was morning of March 11 in Austria at the time that she called. The call, she testified, was answered by Dressler, who called Rybak to the phone.

■ We find the totality of the evidence concerning Dressler's whereabouts on the evening of March 10 does not amount to a legal defense to the promissory note. At the most, the evidence shows the note was signed on a date other than March 10, and Dressler admits the signature is genuine. Dressler testified on direct examination that when he signed the note, the payee's line was not filled in, but that the rest of the promissory note was filled in, such as the date and the amount. He did not describe how the amount was written in figures, and, on cross-examination, he stated he could not recall if the date was filled in. The negotiability of an instrument is not affected by the fact it is undated, antedated or postdated, and where the instrument is dated, the date is presumed to be correct. (Ill. Rev. Stat. 1987, ch. 26, pars. 3—114(1), (3).) Dressler has not contended that the date, if it was not filled in, amounted to a material alteration of the note, and, in fact, any alteration of a note which does not increase the obligation of the maker is not fraudulent and does not discharge the maker. *Hutcheson v. Herron* (1970), 131 Ill. App. 2d 409.

■ Similarly, Dressler's expert witness' testimony that the note was a "raised" note does not establish a defense to the note by a clear preponderance of the evidence. Rybak's expert witness testified there were no indications of alterations on the note, and the court did not specifically find that the note was raised. Dressler's expert witness, Charles Scott, based his opinion that the note was raised on the fact the third zero in the numerical figure "$325.000 00/100" was slightly less ovular than the preceding two zeros, but he admitted he did not compare the third zero with the four zeros which followed in the numerical equation "00/100" and could not testify that the third zero was added sometime later than the preceding two zeros although ink analysis might have revealed this.

In his argument, Dressler particularly emphasizes his and his expert's lack of opportunity to examine the original note and to perform destructive testing of pinhole portions of the note in order to garner further evidence that the note was raised. As Rybak points out, however, she at all times acted in compliance with the court's order which did not permit such destructive testing, and Dressler has not raised as an issue here that it was error for the court to have disallowed such testing. Scott also felt the note was raised due to the use of a period in the numerical figure "$325.000 00/100" rather than a comma, causing him to conclude the original numerical amount was either "$325." or "$325.00 00/100." As Rybak argues, "$325.00 00/100" is a nonsensical figure. Scott's alternate theory that the figure was "$325." negatives his theory that the third zero was added at a later time, since

all three would have been added together to raise the amount to "$325.000 00/100." Further, Scott acknowledged the European practice of using a period rather than a comma in writing figures of more than three digits, and Rybak, who received her education in Europe, introduced in evidence numerous checks written by her which showed she sometimes used a period and sometimes a comma in writing such three-plus figures.

As to the different ink used to fill in the payee line and write the amount of the note in words, Rybak and her son each testified there were several pens on the table in front of them because William was doing his homework, and the one-hour time needed to fill out the note was due to the fact Dressler was packing for a trip to the Bahamas and periodically was in and out of the kitchen. Rybak and her son each also testified she asked Dressler whether the payee line should read "Spomenka Rybak and William Rybak" or "Spomenka Rybak or William Rybak," and Dressler said to use "or." Notably, also, Scott could not testify any of the numbers in the numerical amount of the note were written in different ink. Although Dressler suggests it is absurd and unbelievable that Rybak would not be able to fill out the note herself, Rybak testified she did not remember ever seeing a promissory note, and Dressler testified he himself used such notes on only two or three occasions after 1980.

■■ Dressler's assertion that the evidentiary depositions of Punislav and Virginia Lekovic, Rybak's neighbors, further discredits the note is unpersuasive. The Lekovics related that in June 1982, Rybak asked them to temporarily hide some private financial documents and told them she had Dressler's signature on a note and intended to "fix him" and "get everything he owns." Rather than discrediting the note, however, such evidence lends credence, *inter alia*, to William Rybak's testimony that Dressler riffled his desk in August looking for the note since as early as June of that year Rybak apparently felt it necessary to secrete documents which she considered valuable to her. It is clear from the Lekovics' depositions that the note they saw in June 1982 was in the amount of $325,000.

■■■ As to the issue of consideration, the trial court referred to a lack of "full" consideration in determining that the note was not valid. As Rybak points out, however, the only consideration required is "valuable" consideration which consists of " 'some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other.' *Lipkin v. Koren* (1946), 392 Ill. 400, 406." (*Stolzenbach v. Pagoria* (1979), 71 Ill. App. 3d 863, 866; see also *Anthony Co. v. John-*

*son* (1959), 20 Ill. App. 2d 128.) Consideration sufficient to uphold an ordinary contract is sufficient to validate a promissory note. (*Burke v. Burke* (1980), 89 Ill. App. 3d 826, 829.) Further, in an action on a validly executed negotiable instrument, consideration is presumed. (*Guzell v. Kasztelanka Cafe & Restaurant* (1980), 87 Ill. App. 3d 381, 385; *Stolzenbach,* 71 Ill. App. 3d at 866.) The burden of rebutting the presumption of consideration for a promissory note is on the maker, and such rebuttal must be by evidence of a very clear and cogent nature. (*Davis v. Buchholz* (1981), 101 Ill. App. 3d 388, 392; *Gustafson v. Lindquist* (1976), 40 Ill. App. 3d 152, 157.) The courts generally will not inquire into the adequacy of consideration (*Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330; *Adams v. Lockformer Co.* (1988), 167 Ill. App. 3d 93, 100), and inadequacy of consideration, as opposed to a total want of consideration, is not a defense as against a claim based on a promissory note. (*In re Estate of Ruebush* (1964), 53 Ill. App. 2d 54.) Section 3—408 of the Code provides that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind. Ill. Rev. Stat. 1987, ch. 26, par. 3—408; *In re Estate of Wetmore* (1976), 36 Ill. App. 3d 96, 98; *First National Bank v. Achilli* (1973), 14 Ill. App. 3d 1, 6.

Dressler does not refute Rybak's assertion that consideration for the note is presumed and that it was his burden of proving otherwise. However, his argument is framed under the premise that his signature was not lawfully procured which, as we conclude above, is incorrect. Dressler argues, without citation of authority, that any services Rybak rendered were those a wife might render to a husband's business and, therefore, did not constitute consideration or, alternatively, that Rybak's evidence failed to show "consistent stories" regarding the basis of the bargain for her alleged services performed, or that the delivery of a $325,000 note as consideration for "questionable" loans would be considered unconscionable. The record reflects, and the court found, that over $114,000 was loaned to Dressler by Rybak, and remained unpaid, prior to March 10, 1982. The record further reflects, through the testimony of both Rybak and Dressler, that services were performed by Rybak for Dressler's business from 1977 to 1982. These services included acting as corporate secretary, maintaining books and records of the business, answering phones, tendering contracts to clients, showing lots, attending closings, etc. No remuneration was received by Rybak for these services. Dressler does not refute outright that Rybak performed these services but, rather, argues her claim of past services as consideration for the note must "be questioned" where she offered contradictory versions of the com-

pensation she was to receive as bonuses or commissions. Nor does he refute that Rybak made loans, but argues only they were "questionable" and, at most, amounted to $125,000. If such loans were the "basis of the bargain" for the promissory note, he argues, such consideration was "unconscionable." Plainly, Dressler has not met his burden of rebutting the presumption of consideration for the note by clear and cogent evidence.

We conclude the court's finding that there was no valid note for $325,000 is against the manifest weight of the evidence and must be reversed.

### ADMISSION OF GENUINENESS OF DOCUMENTS

Rybak next argues it was error for the court to fail to rule that defendants be deemed to have admitted the genuineness of the March 10, 1982, promissory note, a March 2, 1981, promissory note for $87,918, and a December 27, 1978, employment agreement between Rybak and the defendants where their response to her Supreme Court Rule 216 motion to admit the genuineness of the documents was untimely and unexcused by any exceptional circumstances.

Defendants respond the court properly refused to so rule where they repeatedly denied the genuineness of the documents in their answers and deposition, where Rybak was not prejudiced by their late response, and where Rybak waived strict application of the rule by introducing evidence at trial as to each document prior to her request for such ruling on automatic admission.

We find no error in the court's refusal to rule that defendants admitted the genuineness of the documents. Supreme Court Rule 216 provides that unless a party's request for admission of the genuineness of relevant documents is either denied or objected to within 28 days after its service, the genuineness of the documents is admitted. (107 Ill. 2d R. 216.) It is plain defendants did not respond within the 28 days, but filed their denial of the genuineness of the documents late, immediately after Rybak moved (three months into the trial) that the court rule on the automatic admission provided for by the rule. Defendants filed a memorandum with an affidavit and exhibits in support of their response to her motion which showed that an answer to her request denying the genuineness of the documents was prepared within the 28-day time period, but that the answer became misfiled in counsel's office and was not filed with the court.

It has recently been held that the court does have discretion to permit the late filing of a response to a party's motion to admit the genuineness of documents. In *Simms v. City of Alton* (1988), 172 Ill.

App. 3d 694, 698, it was stated:

"Supreme Court Rule 216(c) is not to be applied automatically whenever a party fails to timely respond to a request to admit facts, but a circuit court has wide discretion with regard to the requests to admit and may allow a late filing in order to prevent injustice. (*Thomas v. Village of Westchester* (1985), 132 Ill. App. 3d 190, 477 N.E. 2d 49.) Supreme Court Rule 183 provides a circuit court with the authority regarding the circuit court's discretion to permit the late filing of a response to a request to admit facts, as does the case law. (107 Ill. 2d R. 183; *Kismer v. Antonovich* (1986), 148 Ill. App. 3d 508, 499 N.E. 2d 707; *Thomas v. Village of Westchester,* 132 Ill. App. 3d 190, 477 N.E. 2d 49; *Homer G. Dickson & Co. v. Barraza* (1983), 115 Ill. App. 3d 5, 449 N.E. 2d 990; *Daleanes v. Board of Education* (1983), 120 Ill. App. 3d 505, 457 N.E. 2d 1382; *Bluestein v. Upjohn Co.* (1981), 102 Ill. App. 3d 672, 430 N.E. 2d 580.) From these authorities it is clear that the circuit court did have the discretion to permit defendant to file a late response to plaintiff's request to admit facts."

Circumstances in which the circuit court has been found to have discretion to permit the filing of a late response are when (1) a party's late response is the result of circumstances beyond the litigant's control, or (2) the facts or documents sought to be admitted concern a central issue in the case and the requesting party is unable to show prejudice to its case as a result of the late filing. (*Simms,* 172 Ill. App. 3d at 698, citing *Kismer v. Antonovich* (1986), 148 Ill. App. 3d 508, and *Thomas v. Village of Westchester* (1985), 132 Ill. App. 3d 190; see also *Daleanes v. Board of Education* (1983), 120 Ill. App. 3d 505 (noting decisions which have strictly applied the time limit).) The reference in both *Daleanes* and *Simms* to Supreme Court Rule 183 suggests that the trial court's discretion in this matter extends to any circumstances which amount to a showing of "good cause." *Daleanes,* 120 Ill. App. 3d at 509; *Simms,* 172 Ill. App. 3d at 698.

It is clear from the record that the defendants' response to Rybak's request for admission actually was prepared within the 28-day time period, although for reasons of "misfiling" within counsel's office it was not filed with the court. Further, the record shows defendants responded immediately when the fact of the nonfiling was brought to their attention and no intent to obstruct the proceedings or prejudice Rybak is evident. Rybak, in fact, does not suggest what prejudice she may have been caused by the late filing. As such, the trial court did not abuse its discretion in refusing to apply the rule

strictly against the defendants. This conclusion is also supported by the fact the documents Rybak sought to have automatically admitted as genuine were eminently central to the cause. The stated purpose of Supreme Court Rule 216 is to obviate the necessity of proof of facts as to which there is no real dispute. "Using it to *** cover matters that are fairly disputed is a waste of the time of counsel for both sides and the court." (Ill. Ann. Stat., ch. 110A, par. 216, Historical and Practice Notes, at 366 (Smith-Hurd 1985); *Simms*, 172 Ill. App. 3d at 699.) Certainly the documents at issue here were "fairly disputed."

### TOTAL VALUE OF LOANS

Rybak contends the court simply miscalculated the total value of the loans she made to the defendants when it found the amount of business and personal loans she made to the defendants which were nonfamilial in nature totaled $140,696.20 rather than $153,400.06 by her calculation. Subtracting $15,226.58, which was repaid to her, she concludes the court's judgment should have been for $138,190.48 plus interest rather than $125,464.62 plus interest.

■■ The court's judgment did not itemize which loans it included in its judgment. Unlike *Abbott v. Fluid Power Pump Co.* (1969), 112 Ill. App. 2d 303, cited by Rybak, where the court's recalculation was mathematical only, the court here apparently excluded some of the loans on the basis they were not *proven* nonfamilial loans. We cannot agree with Rybak's argument in reply that the court's judgment indicates all "transfers of funds" were loans to be repaid as opposed to "other expenditures" which were familial in light of the court's qualifying language "proven" nonfamilial loans.

As Rybak notes, there were 60 separate loan transactions and 16 automatic transfers of funds. Determining which of these the court may have included in its judgment is not a task which will be undertaken by this court. On this record, it cannot be determined whether the court's judgment represents a simple miscalculation or a calculated omission.

Moreover, since we have determined Dressler's March 10, 1982, promissory note for $325,000 to Rybak was valid, the trial court's judgment awarding her $201,831.59 ($125,464.62 plus interest) will be vacated, and the cause remanded for further proceedings. Rybak testified the $325,000 was given to cover the loans she made to the defendants prior to March 10, 1982, but did not include the interest she claimed in the residence (which claim has been abandoned) or the loans she made to defendants after March 10. Accordingly, we remand

for a determination of the amount of nonfamilial loans made after March 10 which are due and owing over the amount of the $325,000 note.

## DEFENDANTS' CROSS-APPEAL

### PLAINTIFF'S LOANS TO DEFENDANT

■ This issue is rendered moot by our rulings above finding the $325,000 note valid and remanding the cause for a determination of the amount of nonfamilial loans made after March 10, 1982.

### PLAINTIFF'S CONVERSION OF DEFENDANT'S BUSINESS FUNDS

Defendants contend the court's denial of its counterclaim for constructive trust was erroneous and against the manifest weight of the evidence. Defendants' amended counterclaim for constructive trust alleged a fiduciary relationship existed between Rybak and the defendants, which Rybak admitted in her answer. It was further alleged generally—not by specific facts, as asserted by defendants—that she "took large sums of cash and other assets totaling at least Three Hundred Thousand ($300,000) Dollars and various goods and chattels from Defendants/Counter-Plaintiffs for her own use and benefit. All of said taking was done without the knowledge or consent of Defendants/Counter-Plaintiffs." It prayed, therefore, that a constructive trust be imposed upon her assets and judgment in the amount of $300,000 plus costs and attorney fees be granted.

Defendants' argument centers on a check for $5,226.58 drawn by Dressler on the Bank of Clarendon Hills, made payable to the Bank of Clarendon Hills and deposited in Rybak's savings account, and proceeds from construction work done for O.D., Inc.'s, clients Tortoriello and Krajack which were not deposited in the O.D., Inc., accounts.

On examination by her counsel and by defendants as an adverse witness, Rybak testified to numerous automatic transfers of funds from her savings account at the Bank of Clarendon Hills to O.D., Inc.'s, account. Rybak testified that the August 20, 1979, check for $5,226.58 was written by her at Dressler's direction, made payable to the Bank of Clarendon Hills and deposited in her savings account in repayment of some of those transfers. She explained the check was not made payable to her order upon Dressler's suggestion that the tax consequences of the check being written payable to her would thereby be avoided. Rybak testified she and Dressler were both in the bank when the check was written and deposited, and Dressler determined the amount of the check from a slip of paper prepared by Betty Simp-

son, a bank employee, indicating the overdrafts which had occurred on the accounts. The check was written and given to Simpson, who was told that it should be applied to Rybak's savings account. Rybak admitted she subsequently added the notation "Refund to Rybak" when she and Dressler later reviewed the bank statement.

Defendants' argument on the matter of this check concludes with the assertion, "The trial court ruled in favor of Dressler on this issue in crediting him with the check amount in its letter of opinion." It is clear, however, that the court ruled against defendants on their counterclaim for constructive trust. Its implied application of the amount of this particular check as a setoff against the amount of loans it found defendants owed Rybak in her suit for constructive trust against them merely affirms its judgment that the $5,226.58 amount of this allegedly "converted" check was money which rightfully belonged to Rybak, not defendants.

 ██ "A constructive trust is one raised by operation of law and imposed by a court of equity where the legal title to money or property is obtained by a person in violation of some duty owing to him who is equitably entitled thereto. (*Compton v. Compton* (1953), 414 Ill. 149, 111 N.E. 2d 109.)" (*A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 660.) Defendants' evidence was insufficient to show the value of this check was obtained by Rybak in violation of any fiduciary duty owed by her to the defendants. Betty Simpson was not called to testify, and defendants have not pointed to any testimony of Dressler rebutting or denying the circumstances of the deposit of this particular check in Rybak's savings account. As such, Rybak's testimony was uncontradicted and could not be ignored by the trial court.

With regard to the Tortoriello and Krajak construction proceeds, defendants contend that payments in full from these two clients was never deposited in the O.D., Inc., accounts and, therefore, must be in Rybak's possession in violation of her fiduciary duty to them. Defendants' theory is that (1) Rybak generally filled out and sent contractor statements for Dressler in her capacity of employment with O.D., Inc.; (2) O.D., Inc.'s, records indicate that the final balance has never been paid on the Tortoriello and Krajack projects; and, therefore, (3) Rybak billed the accounts, intercepted the payments, and converted the funds to her own use. Defendants' theory lacks evidentiary support.

Instead, the record supports Rybak's argument in response that defendants failed to prove their claim for a constructive trust by a preponderance of the evidence where there is no evidence Tortoriello

and Krajack were ever billed for or ever made any payments on the alleged due and owing final amounts. As Rybak notes, there were problems in the completion of both houses. The Krajacks' house had a problem with water leaking into the house from the patio, and Krajack could not testify he received a final bill or contractor's statement and did not have a cancelled check evidencing payment. Tortoriello discarded his records concerning the construction of the house, but a letter from Tortoriello's contractor to Dressler in July 1977 listed 41 uncompleted items (the house was substantially completed and moved into in April 1977) and showed the Tortoriellos planned to hire out the work to others and set off the charges against those owed Dressler if the items were not completed by August 1.

Defendants' argument in reply that their evidence established a *prima facie* case of conversion is entirely off point where defendants' amended counterclaim does not plead such a cause of action. Conversion is an intentional tort; an action for a constructive trust is a restitutionary remedy and is not one for recovery or compensation under any theory of tort or contract law. (*People ex rel. Daley v. Warren Motors, Inc.* (1985), 136 Ill. App. 3d 505, 510, *aff'd* (1986), 114 Ill. 2d 305.) Assuming, *arguendo*, the cause below sounded in conversion rather than constructive trust, defendants utterly failed to plead or prove an essential element of such a cause: a demand for possession of the funds allegedly converted by Rybak. The authority supporting defendants' assertion, "One who knowingly takes possession of the property of another is liable to that person, whether or not a demand is made for the return of such property," *Landfield Finance Co. v. Feinerman* (1972), 3 Ill. App. 3d 487, has been criticized. See *Hoffman v. Allstate Insurance Co.* (1980), 85 Ill. App. 3d 631, 633; see also *A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 664 (indicating demand has been excused only in cases where the property has been sold or otherwise disposed of).

We conclude the court did not err in denying defendants' counterclaim.

### NEWLY DISCOVERED EVIDENCE

Defendants contend their amended post-trial motion for a new trial should have been granted on the basis of "newly discovered" evidence; namely, an October 6, 1983, letter from Rybak's prior attorney, Thomas V. O'Connor, transmitting to defendants various original documents pursuant to court order entered October 4, 1983, on defendants' "Motion to Produce and Turn Over Original Documents." Defendants claim to have been "surprised" by O'Connor's testimony

at trial that all the documents were returned to Dressler on May 20, 1983. Defendants contend such evidence would have changed the court's judgment with regard to the alleged loans since it would have been established that "Pl. Gr. Ex. 22, 53, Pl. Ex. 187, 22 and 53 had been raised and altered by Rybak while in O'Connor's possession."

Defendants do not identify what these duplicatively numbered exhibits are, nor are the exhibit numbers the same as those shown on the October 6 letter. Assuming, *arguendo*, the exhibits noted in the defendants' argument are included in the list on the October 6 letter, O'Connor testified to having received and returned two "batches" of documents on different dates, the thrust of his testimony being that he had the first batch in his possession for about three days and the second for one day. O'Connor's testimony was incorrect, insofar as his testimony about the two batches related, if at all, to the exhibits shown on the October 6 letter. Defendants cannot disclaim, however, that they knew about the October 6 letter on the date O'Connor testified, June 11, 1986, since the letter was written as the result of a court order entered at their behest. Defendants did not use the October 6 letter to impeach O'Connor's testimony at trial.

 ██ A motion for a new trial made pursuant to section 2—1203 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1203) "is committed to the trial court's discretion [citation], and where based on newly discovered evidence, it must appear that due diligence was used to discover the evidence for trial and that the evidence is so conclusive that it would probably change the result. [Citation.]" (*In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 775.) The only thing "newly discovered" about the October 6 letter was that the defendants failed to use it to their advantage during cross-examination of O'Connor. Moreover, it is unlikely such evidence would have changed the court's judgment since Rybak readily testified to the circumstances under which she added "loan" notations to the memo lines of numerous of the checks after they had been negotiated, and the court nonetheless entered judgment in her favor.

We conclude the court did not abuse its discretion in denying defendant's amended post-trial motion.

### PREJUDGMENT INTEREST

Defendants contend the court's award of prejudgment interest on the amount of the loans found due and owing to Rybak was "grossly inequitable and goes beyond statutory authority." Beyond this bare assertion, defendants' one-sentence argument is that there is nothing in the record which supports calculation of this interest on the basis of a

floating prime rate compounded annually. Defendants cite no relevant authority in support of their argument as required by Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)), and, thus, the issue is waived.

On the merits, however, assuming, *arguendo*, that on remand the court may find loans made by plaintiff to defendants after March 10, 1982, the record supports Rybak's assertion that she testified several times during trial that Dressler repeatedly promised to pay the loan amounts with interest at the prime rate as determined by the Bank of Clarendon Hills.

■■■ Generally, prejudgment interest is not recoverable unless provided for by agreement of the parties or by statute. (*Zokoych v. Spalding* (1984), 123 Ill. App. 3d 921, 938; *Ochoa v. Maloney* (1979), 69 Ill. App. 3d 689.) "In the absence of an agreement, *** a court of equity is vested with broad discretion in awarding interest and thus may give or withhold interest as it deems equitable and just under all of the circumstances. [Citation.]" (*Zokoych*, 123 Ill. App. 3d at 938.) There was evidence here that there was an agreement between the parties that the defendants would pay Rybak such interest on the numerous loans she made. Accordingly, we conclude the court did not err in awarding prejudgment interest.

The judgment of the circuit court of Du Page County finding there was no valid promissory note for $325,000 is reversed, and the cause remanded for entry of judgment in that amount plus interest according to the agreement of the parties from the date of demand, and for computation and award of judgment in the amount of the loans made by Rybak to the defendants after March 10, 1982, plus interest on that amount from September 1, 1982. The court's judgment awarding Rybak $201,831.59 is vacated inasmuch as a portion of the loans included in the court's judgment were also included in the $325,000 promissory note. The court's judgment finding against the defendants on their counterclaim is affirmed.

Affirmed in part; reversed in part; vacated in part and remanded.

LINDBERG, P.J., and REINHARD, J., concur.